**Ester T. HAIRSTON, Jr., Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 83–725.**

District of Columbia Court of Appeals.

Argued Sept. 10, 1985.

Decided Oct. 2, 1985.*

---

* This case was originally entered as a Memorandum Opinion and Judgment. However, on motion of the appellee, and without objection by appellant, it is now being published.

John W. Drury, appointed by this court, for appellant.

Gerald W. Heller, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Kathleen E. Voelker, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEBEKER and FERREN, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

Appellant was indicted for murder in the second degree while armed, D.C.Code §§ 22–2403 (1981), –3202 (1981 & Supp. 1985), and carrying a pistol without a license, *id.* § 22–3204, in connection with the April 29, 1982 shooting death of his girl friend, Lila Jones. Following a jury trial, he was acquitted of the second-degree mur-

der charge but was convicted of the lesser-included offense of voluntary manslaughter while armed. Appellant was also found guilty of the weapons violation. In this appeal, he argues principally that the trial court erred when it denied his pretrial motion to suppress an oral statement he made to a police officer prior to his arrest. Appellant also challenges several evidentiary rulings at trial, to wit: the court's refusal to permit a defense witness to testify about a death threat allegedly made against appellant by Ms. Jones approximately a month before the shooting;[1] the exclusion of certain photographs depicting the scene of the crime; and the introduction of impeachment evidence of appellant's prior convictions for unrelated weapons offenses.[2] Finding no reversible error, we affirm.

According to appellant, who testified in his own defense at trial, on the morning of April 29, 1982, he and a friend, Margaret Roulach, returned to his apartment at 5010 Southern Avenue, S.E., having been there earlier that morning. By his account, as they were ascending the stairs leading to his apartment building, the "kitchen window slid back and Lila [Jones] stuck her head out and started cursing ...[:] yeah, m____ f____, I caught you. I'm going to kill your a____." Appellant was surprised and stood there momentarily, although Roulach had started running. But when appellant saw Jones running toward him wielding a butcher knife, he also fled and then quickly sought refuge in his car, which he had parked on the street. However, he was unable to retreat inside the car safely and, therefore, in order to

---

1. Appellant contends that such testimony, if permitted, would have supported his claim of self-defense.

2. We reject as meritless appellant's final two contentions. Defense counsel sought at trial the admission of certain photographs which purportedly depicted objects obstructing the view of eyewitness Judy Williamson. The photographs, made nearly a year after the shooting, were taken from a position near Williamson's apartment building. However, as defense counsel conceded at trial, the photographs did not truly

and accurately depict the view from Williamson's second-floor bedroom window, from which she witnessed the homicide.

Appellant further contends that the government improperly used for impeachment purposes evidence of appellant's convictions in 1980 and 1971 for carrying a pistol without a license. We find nothing improper in the use of those convictions, *see* D.C.Code § 14–305 (1981), nor do we find improper the manner in which they were used. *See Dorman v. United States,* 491 A.2d 455 (D.C.1984) (en banc).

thwart Jones' attack, brandished a pistol he was carrying at the time and shot her. Appellant contended that it was the presence of Ms. Roulach that prompted his girl friend's attack.

Government witnesses at trial largely discredited appellant's account of the shooting. Judy Williamson, who lived across the street from appellant, testified that she witnessed the incident from her second-floor bedroom window. She recounted that appellant came running out of the apartment, with Jones following, but as she saw it, the two then stopped, faced each other, and "stood there like they were arguing or talking or whatever." She then saw appellant reach into his pocket and pull something out which she was unable to identify. Appellant then raised his arm and shot Jones. According to Williamson, Jones had her arms by her side when shot and did not appear to be holding anything in her hands. At this time, Jones had her back towards Williamson and Williamson's view was essentially unobstructed (appellant's car blocked Williamson's view of the lower part of their legs).

Margaret Roulach testified that she never accompanied appellant back to his apartment after their initial visit. Moreover, she related that while at his apartment earlier that morning, she never saw another woman. Nor did she see a woman chase appellant with a knife. Roulach's six year old daughter, India, who was with her mother that morning, corroborated this testimony after being found competent to testify.

## I.

To further discredit appellant's version, the government elicited testimony concerning two discrepant statements he made to the police, one prior to his arrest and one following his arrest, which detailed the events preceding the shooting. Appellant contends that the pre-arrest statement should have been suppressed as it was a product of custodial interrogation conducted without *Miranda* warnings.[3] We disagree.

At the pretrial suppression hearing, Officer Gerald Gorman testified that he was the first officer to respond to the scene of the shooting. As he approached the apartment building, Gorman saw Jones lying face up on the ground between the sidewalk and the street. Thinking that she had been stabbed,[4] Gorman radioed for an ambulance. While on the radio, Gorman saw appellant about ten feet away on the steps leading to the apartment building walking toward him with a pistol in his hand. Although appellant was not holding the gun in a menacing manner, Gorman immediately drew his revolver, pointed it at appellant, and approached him. When they were about three feet from each other, appellant gave the pistol to Gorman, saying: "I shot her. Here's the gun."[5] Gorman then reholstered his gun and asked appellant what had happened. In Gorman's words, appellant responded that "he was inside fixing hot dogs for lunch with his girl friend and that ... [Jones] had broken into his apartment and threatened him with a knife." Finding this to be an implausible explanation, particularly since the body lay outside, Gorman arrested appellant and advised him of his *Miranda* rights.

Appellant was later taken to the police station where he was interrogated by Detective Frederick Helwig. He was again advised of his rights and, after waiving them, executed a written statement which described the shooting and which was entirely consistent with his account at trial, *i.e.,* that he was attacked while walking toward his apartment with Margaret Roulach, but inconsistent with the version he

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Officer Gorman noticed there was blood on Jones and later observed a knife laying on the ground near her left hand.

5. The admissibility of this statement is not at issue as it was clearly volunteered. *See Lewis v. United States,* 483 A.2d 1125 (D.C.1984).

related to Officer Gorman. The government focused on this discrepancy at trial in discrediting appellant's testimony.

■ Appellant's prearrest statement to Officer Gorman, made after being asked "What happened?", was clearly admissible since it was not the product of custodial interrogation. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any way." *Miranda v. Arizona, supra* note 3, 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted) (quoted in *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). Admittedly, appellant was not free to leave once approached by Officer Gorman; however, the question "what happened" was asked "at the threshold of the encounter [and was] arguably aimed at determining the nature of the situation confronting the police." *Owens v. United States,* 340 A.2d 821, 824 (D.C.1975); *see United States v. Calhoun,* 363 A.2d 277, 283 (D.C.1976). Moreover, there is no suggestion in the record that Gorman's query was probing, accusatory, or likely to elicit an incriminating response, *see Miley v. United States,* 477 A.2d 720, 723 (D.C. 1984), for it was his impression at the time that Jones had been stabbed, not shot. Suppression on these facts is not warranted.[6]

## II

Defense witness Rosa Hudson, a friend of appellant and acquaintance of Jones, testified that she was with Jones a month or so before the shooting doing "her [Jones'] hair." When defense counsel inquired of the conversation they had that day, the government objected on hearsay grounds. At an ensuing bench conference, counsel proffered that Hudson would testify that Jones complained about not getting respect from appellant and that Jones then said, "Well, either I am going to kill him or he is going to kill me." After considerable debate, the court excluded such testimony concluding that it is "the worst type of hearsay ... because the decedent is not here to be cross-examined to counter this." Appellant challenges this ruling, arguing that "[t]he admission came from an uninterested lay witness with direct evidence of the decedent's specific attitude towards appellant and her intention to kill him if she did not get respect."

■ Under the state-of-mind exception to the hearsay rule, *see Rink v. United States,* 388 A.2d 52, 57 (D.C.1978), evidence of uncommunicated threats of the decedent against the defendant is admissible "[w]hen a defendant claims self-defense and there is substantial evidence, though it be only his own testimony, that the deceased attacked him...." *Griffin v. United States,* 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950) (quoted in *Kleinbart v. United States,* 426 A.2d 343, 357 (D.C. 1981)). In self-defense cases, "the victim's mind is of particular concern to the jury." *Clark v. United States,* 412 A.2d 21, 25 (D.C.1980) (citations omitted). Thus, when this defense is raised, it is generally recog-

---

**6.** Appellant cites *Miley v. United States, supra,* arguing that it mandates reversal here. However, as the government suggests, *Miley* is clearly distinguishable. In that case, a police officer investigating a homicide obtained a description of the suspected killer and, while on patrol hours later, discovered a man hiding in a stairwell who matched the description. The officer then drew his revolver and ordered the man to come forward. When he did so, the officer observed a pistol in the stairwell. The officer then asked the suspect whether the pistol was registered and why he had it in his possession. This court held that the suspect's response to these questions was the product of custodial interrogation without the requisite *Miranda* warnings. 477 A.2d at 724.

Unlike Officer Gorman's inquiry in the instant case, the officer's inquiry in *Miley* was "not likely to elicit a credible, innocent explanation, and went well beyond the general exploratory inquiries associated with an investigatory stop." *Id.* The officer's questions were probing and pressing, *id.* at 723–24, whereas Officer Gorman's question, "What happened?", was reflexive and designed only to aid him in his initial evaluation of the scene. *Compare Hammill v. United States,* 498 A.2d 551, 558–59 (D.C.1985).

nized that hearsay evidence of prior threats is probative of whether the defendant was likely to be the aggressor in the altercation and whether the defendant reasonably apprehended imminent, serious bodily harm from the decedent. *Id.* at 26 (citations omitted); *see Rink, supra,* 388 A.2d at 55. However, "[t]he determination whether to admit such evidence ... is committed to the discretion of the trial court, which must balance its probative value against the dangers of prejudice, confusion, and delay." *Rink, supra,* 388 A.2d at 57 (citing *United States v. Brown,* 160 U.S.App.D.C. 190, 195, 490 F.2d 758, 763 (1973)). We hold that Jones' purported threat against appellant falls within the state-of-mind exception, and is more probative than prejudicial; consequently, the trial court erred in excluding Hudson's testimony.

We are nevertheless persuaded that this error was harmless. The record is replete with references to Jones' sometime acrimonious behavior toward appellant. For instance, Hudson testified that she had witnessed two or three fights between them, one of which resulted in Jones hitting appellant and throwing a bottle and a brick at his car. According to appellant, Jones threatened him the day before the shooting,[7] and then again immediately before the incident when she stuck her head out his apartment window. Moreover, there was considerable testimony concerning Jones' violent nature.[8]

■ Notwithstanding, the government presented a convincing case against appellant: from Judy Williamson's view, the homicide was unprovoked; there is a marked discrepancy between the prearrest and post-arrest statements appellant made to the police; and further, the version appellant promoted at trial was discredited by the testimony of Margaret Roulach and her

daughter, seemingly disinterested witnesses. In short, it seems we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *see* D.C.Code § 11–721(e) (1981).

Accordingly, the judgment is

*Affirmed.*

---

7. In his written statement to the police, which was introduced into evidence at trial, appellant stated that Jones threatened him the day before the shooting, that he reported this to the police, and that the police advised him to get a peace bond to stop her threats.

8. For example, defense witness Anthony Frazier, who lived in the same building as Jones, testified that he had known her for about two years and that she had a reputation for getting in fights with people in their building.