*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-755

TROY D. RICHARDSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-11069-09)

(Hon. Gerald I. Fisher, Trial Judge)

(Argued December 5, 2013                    Decided August 28, 2014)

*Edward F.C. Gain, Jr.* for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Laura Bach*, and *Melinda Williams*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and BELSON, *Senior Judge*.

BELSON, *Senior Judge*: Troy Richardson appeals from a judgment of

conviction of voluntary manslaughter while armed and carrying a dangerous

weapon (prior felon) (CDW).[1] He contends that the trial court abused its discretion both in excluding evidence that supported his self-defense claim and in admitting evidence that, in the months and years before the stabbing, he regularly used PCP, and that the drug caused him to behave bizarrely. We agree that the trial court erroneously exercised its discretion in excluding certain evidence that supported Richardson's self-defense claim, that the error was not harmless, and that reversal is therefore required. Richardson does not mention the CDW conviction in his appeal brief, but because a finding that Richardson acted in self-defense would control the resolution of the CDW conviction,[2] we conclude that a new trial on both charges is appropriate.

The trial that we order today will be Richardson's third on these two charges. On January 8, 2010, Richardson was charged by indictment with first-

---

[1] D.C. Code §§ 22-2105, -4502, -4504 (a) (2012 Repl.).

[2] D.C. Code § 22-4504 (a) (2001). Self-defense is a defense to a CDW charge for a person who is not carrying the weapon before the danger arises. *See, e.g.*, *Mack v. United States*, 6 A.3d 1224, 1229-30 (D.C. 2010) ("[We have] long recognized that one is not guilty of carrying an unlicensed gun during the period it is actually used in self-defense. However, this doctrine is inapplicable where one anticipating harm carries a pistol in public for a period of time before the actual danger arises." (internal quotation marks and citations omitted)).

degree murder while armed[3] and CDW in the May 17, 2009, stabbing of Tyrone Wheaton. On September 17, 2010, a jury found Richardson not guilty of first-degree and second-degree murder while armed, but was unable to reach a verdict on the charges of voluntary manslaughter while armed and carrying a dangerous weapon, and the court declared a mistrial. On April 6, 2011, a second jury found Richardson guilty of those charges. As we will explain, the first jury heard evidence that Richardson had "snitched" on Wheaton and his family, and that Richardson believed that Wheaton knew that he had done so. The trial court did not allow Richardson to present most of this evidence to the second jury, ruling that Richardson's speculation about what Wheaton believed was not relevant.[4] Because Richardson's self-defense claim was premised substantially on his own reasonable perceptions about what was happening between Wheaton and him, and because evidence that Richardson snitched on Wheaton and his family was relevant to whether his fear of imminent death or serious bodily harm at Wheaton's

---

[3] D.C. Code § 22-2101 (2012 Repl.).

[4] The first jury heard this "snitch" evidence, but only because the government "opened the door" to it during the first trial by asking Richardson why he didn't tell the police that Wheaton's brother had given him drugs that morning, allowing him to explain that he had already told police that Wheaton's family was selling drugs from their apartment. Although the jury heard this evidence, trial counsel did not argue or explain its relevance at closing.

hands was reasonable, Richardson should have been permitted to present this evidence to the jury.

## I.

In the early evening of May 17, 2009, police responded to a 911 call from 2424 Elvans Road in Southeast, D.C., and found Tyrone Wheaton lying motionless and nonresponsive in the doorway to apartment 203, where he lived. The Chief Medical Examiner for the District of Columbia, who performed an autopsy on Wheaton, testified that he died from acute blood loss from a stabbing that punctured his aorta and left a wound seven to eight inches deep.

Earlier that afternoon, Wheaton had brought his girlfriend and their two sons, then twelve and thirteen, to dinner at his apartment, where he had lived for some years with his mother, Deborah Sparks, and two siblings. Appellant Richardson, another long-time resident, lived across the hall in apartment 202.

According to Deontrae Ingram, a sixteen year-old neighbor, Richardson was outside on the porch in front of 2424 Elvans Road that afternoon smoking a "dipper" (a tobacco or marijuana cigarette dipped in PCP) when Wheaton

approached him. The two fought,[5] and a crowd gathered to watch. Ingram, the only member of that crowd to testify, said that after the fight Wheaton returned to his apartment, and Richardson ran up the stairs after him, yelling, "I'm a kill you bitch, I'm a kill you."

Ingram continued inside to an inner stairwell which gave him a view of the landing between Richardson's and Wheaton's apartments. He said that while Wheaton was standing in the hallway between apartments 202 and 203 talking to his mother, Richardson "peeked" out of his door, then stepped out into the hallway and punched Wheaton.

Deborah Sparks, Wheaton's mother, had been inside apartment 203 that afternoon preparing dinner, and she testified that Wheaton went outside the building briefly and returned a few minutes later, appearing upset, and then went into the hallway. Hearing a commotion in the hall, she went to her apartment doorway. She heard Richardson say, "call the police, call the ambulance, because he's about to die." She then saw Richardson emerge from his apartment, stab

---

[5] Testimony left it unclear who started the fight.

Wheaton, and quickly return to his apartment.[6]  Wheaton's sister, Jessica Sparks, who also lived in apartment 203, said that she was returning home when she heard about the stabbing from a neighbor, at which point she ran up the stairs, retrieved a yellow and black crowbar that the family kept in the living room, and banged on Richardson's door with it.

Wheaton's sons were called by the defense.  They saw the events from the living room of apartment 203, which gave them a partial view into the hallway.[7]  At trial, one son testified that after Richardson, unarmed, took a swing at Wheaton, Wheaton entered apartment 203, grabbed a yellow and black crowbar from the living room, and returned to the hallway.  Richardson, then armed with a knife, swung at Wheaton and missed, and Wheaton swung the crowbar at Richardson. He did not see whether Wheaton hit Richardson with the crowbar.  Richardson then backed up and took a third swing at Wheaton with the knife.  The other son testified that he saw Wheaton, angry and yelling, grab the crowbar from behind the TV in the living room, and return to the hallway.  He said that Richardson stabbed his father twice, and his father then walked back into apartment 203.

---

[6]  Another witness, a neighbor, gave a similar account of the events.

[7]  Their view of the hallway was obscured by a partial wall, and by their mother and grandmother who were standing in the doorway.

Richardson testified at trial, saying that Wheaton approached him when he was sitting on the porch outside 2424 Elvans Road that afternoon.[8] He said that Wheaton "came up the steps, stood over top of me. And I looked up and he said 'You snitch-ass bitch.'" Then Wheaton attacked him. Seeking safety, he went upstairs to his apartment. He said he was unlocking his apartment door when he heard a woman's voice say, "kill his ass, kill his ass," and he then felt "something hard hit my back."[9] Richardson said he grabbed a knife that was sitting on a "half-wall" or a ledge by his door as Wheaton was trying to force his way into Richardson's apartment. He admitted to stabbing Wheaton with it. Afterward, Richardson said he returned to his apartment, locked the door, and stayed there for several hours. During that time, according to Officer Kelan Edwards who responded to the 911 call, Richardson was listening to music and popping popcorn. Edwards testified that he banged on Richardson's door with his fist and with a baton, and identified himself as a police officer, only to hear a man's voice say,

---

[8] Richardson said that he used cocaine and marijuana that day, but denied smoking a "dipper." He did admit to regular PCP use.

[9] Richardson also said that Wheaton "grabbed me and slammed me on the ground, pinned me down, began to choke me, smacked me, picked me up and try to throw me down the steps" outside, but officers who responded to the 911 call noticed no signs that Richardson had been injured, even though they asked him to turn around and lift his shirt. Nor did he claim to be injured.

"get the fuck away from my door." Richardson finally emerged only after police cut the power supply to his apartment.

## II.

As the jury in Richardson's first trial learned, but the jury in the trial before us did not, the Sparks-Wheaton family occasionally sold drugs out of apartment 203, and Richardson, a longstanding drug addict, was a regular buyer. Approximately six months before he stabbed Wheaton in May of 2009, Richardson informed police about drug sales from apartment 203. He spoke several times with Sergeant Yurell Washington of the Metropolitan Police Department, providing Wheaton's name and the make and license plate number of the car Wheaton drove. According to Richardson, after he spoke with Sergeant Washington, but well before the stabbing, police executed a search warrant at apartment 203 and arrested at least one family member for drug crimes on the basis of that search.[10]

In the first trial, Richardson called as a witness Sergeant Washington, who confirmed that he spoke to Richardson several times by phone, and sent undercover investigators to the area based on Richardson's information, but that

---

[10] In the first trial, Richardson indicated that apartment 203 was searched in November 2008, and the government also indicated in colloquy with the court during the second trial that there was a search of the apartment that fall.

information never "panned out." Sergeant Washington testified that he did not execute a warrant on apartment 203, and he heard about the executed warrant only from Richardson himself.

This evidence came in during Richardson's first trial when his counsel asked him why he did not tell the police that he stabbed Wheaton in self-defense. He explained,

> I didn't feel comfortable with the two detectives . . . because I gave the police information—the Narcotic Division about narcotics being sold out apartment 203 and when I first spoke with the Narcotic Detective I didn't want to give out my name because I didn't want my name leaked out because once you're known in the neighborhood as being a snitch its repercussions behind it.

Richardson also explained that he never met with Sergeant Washington in person, because "I didn't want to sign no papers to be—like I explained to you, your name gets leaked in the community as a snitch. Once you give information up, somehow, some way people find out that you're giving information up."

At the outset of the second trial, the government moved to exclude as irrelevant Richardson's statements that he spoke to Sergeant Washington about

drug sales from apartment 203 months before the stabbing, that he believed that the search subsequently executed on that apartment was based on information he provided, and that Wheaton's brother sold him drugs the morning of the stabbing. Richardson opposed the motion, saying that the point of introducing the evidence was "to just go with the whole idea that he was still trying to help the police and that his theory of why Tyrone Wheaton was coming after him was because the family had decided he was a snitch." The court responded as follows:

> [Court]: But what would be your evidence of that?
>
> [Defense Counsel]: This was Mr. Richardson's –
>
> [Court]: That doesn't matter, though. That's not relevant on that issue, that he thought that they believed he was a snitch. I don't see how that has anything to do with who sold him the drugs or anything of that nature.
>
> . . .
>
> [Defense Counsel]: Well, very well, you know, I'll keep away from that on direct, . . .
>
> [Court]: . . . And what about the search warrant issue, which is a little bit related to this?
>
> [Defense Counsel]: It's the same thing. It's related in Mr. Richardson's mind that he got – this attack was happening because of him cooperating with the police. We're not going to go into that. I won't go into it on direct.
>
> [Court]: Right, but Mr. Richardson needs to know that unless specific approval has been given for that subject matter, he can't testify. Even if you don't ask the

question, Mr. Richardson can't testify about that because it's not relevant without more.

[Defense Counsel]:  Very well.

The court then went on to address Richardson directly, and in doing so expanded the scope of its ruling.

[Court]:  Mr. Richardson, . . . what you think people may have thought about you, just that view without more, is not relevant.   If you think somebody was doing something because you believe they had a particular thought, that's not relevant unless you can prove that, in fact, they did have that thought. . .

. . .

[Defendant]:  But that's part of the theory of my defense–

[Court]: . . . [B]ut just because you think something was happening doesn't necessarily mean that you get to testify about it just because you want to make that part of your theory.

Later, before he testified, Richardson asked the court directly whether he could explain why he thought Wheaton had attacked him.  The court said that Richardson could testify that Wheaton called him a "snitch-ass bitch" when they fought that afternoon, but he could not present his "speculation about what Mr. Wheaton, why he might have been angry at you or what was going on in his mind

as opposed to what he said or did. And so what you might think he was thinking is not a proper topic for you to testify about." The court explained that,

> [Court]: Well, but you see the problem with that, Mr. Richardson, is . . . you have to show a link between that and these events. Not that you think there's a link, but that there actually is a link.
>
> [Defendant]: Well, actually from the incident and me speaking with the police. Giving the police information about —
>
> [Court]: But that's not a sufficient link, in my view, . . .

Thus, the trial court allowed Richardson to say that Wheaton called him a "snitch-ass bitch" that afternoon, but it excluded (1) evidence that Richardson obtained drugs from Wheaton's brother the morning of the stabbing; (2) evidence that, months before the stabbing, Richardson spoke to police about drug sales from apartment 203 and that police executed a search warrant there; and (3) testimony by Richardson that he believed that Wheaton knew that he actually talked to the police.

## III.

The trial court excluded this evidence (the "snitch" evidence) as irrelevant. A trial court has broad discretion to make evidentiary rulings because of its

familiarity with the details of the case and expertise in evidentiary matters, and we review that ruling for abuse of discretion. *(Markus) Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008). When we review for abuse of discretion, we apply a five-part test in which we consider: "(1) whether the decision at issue was committed to the trial court's discretion; (2) whether the trial court recognized that it had discretion and whether it purported to exercise it; (3) whether the record reveals sufficient facts upon which the trial court's determination was based . . . ; (4) whether the trial court . . . failed to consider a relevant factor [or] relied upon an improper factor, and whether the reasons given reasonably support the conclusion; and (5) whether the error, if any, was harmless." *Dawkins v. United States*, 41 A.3d 1265, 1270 (D.C. 2012) (internal quotation marks omitted) (quoting *Johnson*, 960 A.2d at 295).

Relevant evidence is evidence that "tend[s] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *In re L.C.*, 92 A.3d 290, 297 & n.21 (D.C. 2014) (internal quotation marks, brackets, and citation omitted); *accord Campos-Alvarez v. United States*, 16 A.3d 954, 959-60 (D.C. 2011). The trial court enjoys particularly broad discretion in determining the relevance of a piece of evidence because the inquiry is fact-specific and proceeds under a flexible standard. *United States v. Mosby*, 495 A.2d

304, 305 (D.C. 1985) (citing *United States v. Kearney*, 420 F.2d 170, 171 n.1 (D.C. Cir. 1969)).

Our general rule is to grant broad deference to the trial court's determination of relevance, but we do not regard relevance as a particularly high bar for the proponent of the evidence to clear, *see Street v. United States*, 602 A.2d 141, 143 (D.C. 1992), and we are more searching in our review of a ruling that a piece of evidence is irrelevant if the appellant makes a showing that it was central to his or her defense. *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010) ("An evidentiary ruling . . . is a highly discretionary ruling that will be upset on appeal only upon a showing of grave abuse. But such discretion does not extend to the exclusion of crucial relevant evidence establishing a valid defense." (quoting *Price v. United States*, 697 A.2d 808, 818 (D.C. 1997) (internal quotation marks and citations omitted))).

It is undisputed that the trial court recognized and exercised its discretion. The trial court granted the government's specific requests to exclude Richardson's testimony that he acquired drugs from a member of Wheaton's family earlier that day, and that police had executed a search warrant at apartment 203 in the fall of 2008. After granting those requests, the court extended its ruling to exclude

Richardson from testifying that he informed police about drug sales from apartment 203. The trial court explained that evidence that Richardson informed on Wheaton cannot bridge the gap to establish, or even support, any factual conclusion about what Wheaton actually knew, and that absent any additional independent evidence about what Wheaton actually knew or believed, Richardson's speculation about what he believed would be deemed by the court to be irrelevant.

We next consider whether the trial court's ruling was based on a sufficient factual foundation in the record, and whether the trial court considered every proper factor and no improper factors, and whether the court's reasoning actually supports its ruling. We conclude that the trial court required Richardson to prove too much. The trial court said that the "snitch" evidence could not bridge the gap between what Richardson believed about what Wheaton thought and what Wheaton actually thought. However, in order to raise self-defense in this case, Richardson did not have to show that his beliefs underlying his self-defense claim were true, only that they were reasonable and honestly held. *Swann v. United States*, 648 A.2d 928, 930 (D.C. 1994).

As this court has observed, the standards for making a self-defense claim in a homicide case are exacting: Richardson was entitled to an acquittal on that basis only if the jury concluded (1) that he honestly believed that, when he stabbed Wheaton, he was in imminent danger of serious bodily harm or death, and that he had to use lethal force to save himself from that harm; and (2) that both beliefs were objectively reasonable. *Id.* (citing cases and the Criminal Jury Instructions for the District of Columbia, Nos. 5.12, 5.13 (4th ed. 1993)).[11] Furthermore, the first aggressor in a conflict cannot claim self-defense. *Martin v. United States*, 452 A.2d 360, 363 (D.C. 1982). In excluding the "snitch" evidence for irrelevance, the trial court implicitly concluded that the proffered evidence was not relevant to any part of Richardson's self-defense claim.

---

[11] Once the defendant has established sufficient evidence to justify giving the jury a self-defense instruction, the burden shifts to the government to disprove beyond a reasonable doubt the defendant's self-defense claim by showing that these conditions are not met. *See Comber v. United States*, 584 A.2d 26, 41 & n.17 (D.C. 1990). As this court has explained, *see id*. at 41, self-defense claims fall into two categories: "perfect" and "imperfect." To make out a "perfect" self-defense claim, the defendant's beliefs that that lethal force was required to prevent imminent death or serious bodily harm must be objectively reasonable. If they are objectively unreasonable but honestly held, then the claim is "imperfect." Here, because Richardson is facing a voluntary manslaughter charge, he must make out a "perfect" self-defense claim to be entitled to an acquittal. *See generally id*. at 37-40 (explaining the two types of self-defense claims and their interaction with the various types of homicide charges).

A person's right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening. *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984); *see also Johnson*, 960 A.2d at 297. The court's self-defense instruction put at issue Richardson's beliefs about what was happening and the objective reasonableness of these beliefs.

Here the trial court concluded, in effect, that the "snitch" evidence was not relevant to what Wheaton actually believed. However, it is Richardson's beliefs, rather than Wheaton's, and the objective reasonableness of those beliefs, that are at issue in his self-defense claim; the trial court's failure to consider this factor was error.

The "snitch" evidence was relevant to Richardson's self-defense claim in several ways. First, Richardson said he believed that people who become known as "snitches" in the community face repercussions, and that he therefore tried to hide his dealings with the police. He was reluctant to meet Sergeant Washington in person, because he feared that it would get "leaked" to the community, and "once you give information up, somehow, some way people find out that you're giving information up." Richardson gave police specific information about

Wheaton, and the police subsequently searched Wheaton's apartment and arrested at least one family member. Because Richardson indicated that he believed that people would somehow learn what he did, the jury could find that Richardson honestly believed that Wheaton knew what he had done, and that he therefore feared "repercussions" from Wheaton, in the form of serious bodily harm or death, and that the lethal force he actually used was necessary to prevent that harm.

Second, the "snitch" evidence is relevant to Richardson's credibility, in that it supports and explains Richardson's testimony that Wheaton called him a "snitch-ass bitch" when they fought outside. A jury that heard the other "snitch" evidence might be more inclined to credit that piece of Richardson's testimony, which might otherwise appear to be an isolated and perhaps not credible attempt on Richardson's part to fabricate a motive and impute it to the deceased Wheaton, who is not in a position to contradict his testimony. The fact that Richardson actually had talked to the police about Wheaton could be viewed as explaining to the jury why Wheaton might indeed have made that remark.

The "snitch" evidence is also relevant to the objective reasonableness of Richardson's beliefs. First, it provides context for Wheaton's "snitch-ass bitch" remark that makes that remark seem more ominous and threatening. Even if the

jury credited Richardson's statement that Wheaton called him a "snitch-ass bitch" that afternoon, the jury might find it speculative to conclude from that evidence alone that Richardson reasonably believed that Wheaton thought that Richardson had spoken to the police and had given them information about Wheaton and his family. The other "snitch" evidence gives the jury at least a tentative basis from which to draw that inference and a context that makes it more plausible. It also ties in with Richardson's testimony that he felt "something hard" hit his back when he and Wheaton were in the hallway. The snitch evidence is relevant to what Richardson believed was happening in that moment. Although the objective reasonableness of Richardson's beliefs is a jury question, the factual backgrounds of some of our cases demonstrate that the consequences of being perceived as a "snitch" can be serious indeed. *See, e.g.*, *Winfield v. United States*, 676 A.2d 1, 3 (D.C. 1996) (en banc) (victim survived being abducted, stabbed, shot, and left for dead in the woods only to be fatally shot on the street weeks later because she co-operated with the government in its investigation of an armed robbery).

For the foregoing reasons, we conclude that the trial court failed to take into account certain factors that it should have considered in deciding whether the

"snitch" evidence was relevant.[12] Its ruling was therefore an erroneous exercise of discretion.

## IV.

Because the court erroneously exercised its discretion in excluding the "snitch" evidence described above, we consider whether the error was harmless—the fifth part of the five part test we apply in order to determine whether the court abused its discretion. The government urges that we apply harmless error review and affirm if "we can say, 'with fair assurance, after pondering all that happened and without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Clark v. United States*, 639 A.2d 76, 84 (D.C. 1996) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (internal alterations omitted). Richardson argues that we should instead apply the more stringent constitutional harmless error test of *Chapman v. California*, and affirm only if we are convinced beyond a reasonable doubt that the error was

---

[12] We have recognized that the victim's beliefs are also relevant to a self-defense claim. *See, e.g.*, *Riddick*, 995 A.2d at 217 ("[W]here the defendant in a murder case admits killing the victim but has asserted a complete defense such as accident or self-defense, the victim's mind is of particular concern to the jury." (citing *(David) Clark v. United States*, 412 A.2d 21, 25 (D.C. 1980)); *Hairston v. United States*, 500 A.2d 994, 997-98 (D.C. 1985); *Hill v. United States*, 600 A.2d 58, 61 n. 3 (D.C. 1991)).

harmless. *Clark*, 639 A.2d at 81 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Review of the error under the *Chapman* standard is appropriate if the exclusion of evidence prevented Richardson from presenting a complete defense. We conclude that under the circumstances reversal is required under either *Kotteakos* or *Chapman*. As we will explain, we reach that conclusion by applying the test for reversible error set forth in *Heath v. United States*, 26 A.3d 266 (D.C. 2011).

Defendants have a constitutional right to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Our interpretation and application of the rules governing admissibility of evidence must therefore accommodate that right. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."). While this principle applies to our interpretation of the rules governing relevance, those rules do not mutate to accommodate theories of defense. However, even where a defendant's constitutional right to present a complete defense is not at stake, "[i]t is well settled that if the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. It would be a narrow rule, and not conducive to the ends of

justice, to exclude it on the ground that it did not afford full proof of the non-existence of the disputed fact." *Home Ins. Co. v. Weide*, 78 U.S. (11 Wall.) 438, 440 (1870).

Over the past two decades our case law has refined the contours of the concept of the complete defense that a defendant has a right to present. Defendants do not have an unfettered right to present any evidence whatsoever. *See, e.g.*, *Roundtree v. United States*, 581 A.2d 315, 327 (D.C. 1990) (exclusion of evidence about the appearance of sexual assault victim's genitals did not prevent defendant from presenting a complete defense when defendant could not articulate a legitimate basis for its admission). Rather, defendants have a right to present "crucial relevant evidence establishing a valid defense." *Price v. United States*, 697 A.2d 808, 813 (D.C. 1997) (internal quotation marks omitted). Not all relevant evidence meets this bar. For instance, in *Riddick*, 995 A.2d at 216, the trial court excluded the victim's handwritten note revealing her distress that appellant was "pulling away . . . more and more." The defendant wanted to use the note to establish that the victim's distress could have led her to react aggressively toward him, but he was able to present other more persuasive evidence of the victim's anger and jealousy toward him in the months before her death. *Id*. at 220. In *Clark v. United States*, 639 A.2d 76, 81 (D.C. 1993), the trial court excluded

from evidence a photo array from which a witness identified appellant. The defendant wanted to use the photo array to undermine the government's assertion that he reason the witness was hesitant about her identification of the defendant was that the photos in the array looked so similar. *Id*. at 82. We affirmed in both *Riddick* and *Clark*, having concluded that neither exclusion prevented the defendant from presenting a complete defense because the defendant had ample opportunity to present other evidence supporting those defenses. *Id*.

Generally, our inquiry into whether an exclusion of evidence prevented a defendant from presenting a complete defense is highly fact-specific. We have found, for instance, that exclusions of relevant evidence have constitutional implications when they limit the defendant's ability to explain a witness's potential biases to the jury. *See, e.g.*, *Scull v. United States*, 564 A.2d 1161, 1166 (D.C. 1989) (limits imposed on appellant's cross examination prevented appellant from presenting complete defense when "there was a realistic chance that the proposed cross-examination had an impact on the outcome of the trial [because] it might have led the jury to doubt dispositive testimony against appellant . . . ."); *Bassil v. United States*, 517 A.2d 714, 716 (D.C. 1986) (exclusion of evidence about witness's reputation for untruthfulness prevented appellant from presenting complete defense). The right to present a complete defense also entitles the

defendant to present fully its theory of the case. *See, e.g.*, *McDonald v. United States*, 904 A.2d 377, 382 (D.C. 2006) (exclusion of evidence of extent of appellant's injuries sustained during arrest deprived appellant of right to present complete defense where defendant's theory was that police fabricated charges against him to cover up their use of excessive force); *Howard v. United States*, 656 A.2d 1106, 1118 (D.C. 1995) (exclusion of testimony from appellant and another witness that victim had previously threatened appellant with a gun and fired a shot at appellant deprived appellant of "meaningful opportunity" to present evidence on provocation defense and therefore violated defendant's right to present complete defense).

Until the time this court issued its opinion in *Heath*, 26 A.3d 266, there remained the question how the court should determine whether excluded evidence was so critical to the defense that its exclusion violated a defendant's constitutional right to present a defense. In *Heath*, we adopted a modified version of an objective materiality test that the United States Court of Appeals for the Second Circuit, borrowing from the materiality standard set forth in *United States v. Agurs*, 427 U.S. 97 (1976), had adopted in *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996). In *Heath*, we wrote,

> [W]hether an erroneous exclusion of defense evidence violates the defendant's constitutional right to present a defense depends upon whether *there exists a reasonable probability* that the omitted evidence, evaluated in the context of the entire record, would have led the jury to entertain a reasonable doubt that did not otherwise exist.

*Heath*, 26 A.3d at 281 (emphasis in original to indicate the difference between this rule and the Second Circuit's rule articulated in *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000)).[13]

In *Heath*, we observed that we reach the same result under *Kotteakos* or *Chapman* whenever exclusion of evidence reaches reversible error of constitutional magnitude. *Heath*, 26 A.3d at 281.[14] The evidence that a defendant is constitutionally entitled to present is precisely that evidence that, in the context of the entire record, stands a reasonable chance of turning the trial. And where that is the case, when we turn to harmlessness review of either stripe, we will be unable to say with fair assurance that the exclusion of such evidence did not substantially

---

[13] Because *Heath* was decided on July 21, 2011, several months after Richardson's trial, the trial judge in this case did not have the benefit of this decision when trying this case.

[14] We observe that "commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal." *Washington v. Recuenco*, 548 U.S. 218 (2006) (citing *Neder v. United* States, 527 U.S. 1, 8 (1999)).

sway the outcome, and or that its exclusion was harmless beyond a reasonable doubt.

We apply the *Heath* test to determine whether the trial court's exclusion of the "snitch" evidence restricted Richardson from presenting a complete defense. Richardson's defense was, in part, that he feared that Wheaton knew that he had given police information about drug sales from apartment 203, and that that is why Wheaton attacked him on the porch, and also why, when the fight continued inside the apartment building, he reasonably believed that Wheaton might kill or inflict serious bodily harm on him, and that lethal force was required to prevent that. The court prevented Richardson from presenting certain evidence that would have helped him explain to the jury why these fears were reasonable. Although Richardson was allowed to testify that Wheaton called him a "snitch-ass bitch" when they fought outside their apartment complex, this single piece of evidence did not go far in explaining why Richardson might reasonably have feared that Wheaton knew that he had given police information about Wheaton's drug sales. *See Howard*, 656 A.2d at 1118 (appellant's single statement that the victim had shot at him in the past was "so cryptic [and] so devoid of details" that appellant was deprived of a meaningful opportunity to present a provocation defense). That isolated piece of testimony would not have given the jury adequate reason to

believe that Richardson feared that Wheaton knew what he had done and sought to retaliate, and no context from which to consider whether that fear was a reasonable one.[15] The excluded evidence also has the potential to make Richardson's testimony that Wheaton called him a "snitch-ass bitch" more credible.

Furthermore, the government's evidence against Richardson was not overwhelming, and this matters when we consider what effect the additional excluded evidence could have had on the outcome. There was already evidence in the record that Wheaton hit Richardson with a crowbar, and the "snitch" evidence could have led the jury to re-evaluate the relevance and credibility of that testimony. The excluded evidence would have provided the jury with additional reasons to credit parts of Richardson's testimony and that of other defense witnesses, and it would have provided evidence that Richardson honestly and reasonably feared imminent death or serious bodily harm at Wheaton's hands, and that he honestly and reasonably believed that lethal force was necessary to prevent

---

[15] We note that appellant's argument that the "snitch" evidence was crucial to the defense is undercut somewhat by the fact that at the first trial defense counsel did not mention the admitted evidence about snitching in his closing argument, yet won acquittal on the murder charge. We also note, however, that in the first trial, appellant was able to assert a defense of imperfect self-defense to the charges of first-degree and second-degree murder, but not to the lesser-included offense of manslaughter. To succeed with a self-defense theory as to manslaughter appellant had to make a showing that his fear of death or serious bodily harm was objectively reasonable, and the "snitch" evidence could have helped establish this.

that harm. We therefore conclude that there is a reasonable probability that the omitted evidence, evaluated in the context of the entire record, would have led the jury to entertain a reasonable doubt that did not otherwise exist, and that the exclusion therefore prevented Richardson from presenting a complete defense in violation of his constitutional rights. *See Heath*, 26 A.3d at 281. For these same reasons, we are not convinced that the trial court's erroneous exercise of discretion in excluding the "snitch" evidence was harmless beyond a reasonable doubt. Reversal of these convictions is therefore required.[16]

Accordingly, for the foregoing reasons we reverse Richardson's convictions for voluntary manslaughter while armed and carrying a dangerous weapon and remand the case to the trial court for further proceedings.

---

[16] As Richardson's convictions are being reversed and the case will most likely be tried again, the trial court will be called upon again to make the highly discretionary rulings concerning the evidence of past crimes and other bad acts attributed to Richardson. The rulings will be made on the basis of the record at that trial. While we will comment that the rulings that admitted evidence of Richardson's acts on the day of the homicide appear well within the court's discretion, we remark that rulings on appellant's use of PCP on the days and months before the homicide, and his behavior after such use, may present more difficult questions. Accordingly, the trial court should state the basis of its rulings, applying the principles regarding such matters in *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964); *(William) Johnson v. United States*, 683 A.2d 1087 (D.C. 1996) (en banc); *United States v. Morton*, 50 A.3d 476 (D.C. 2012); *Harrison v. United States*, 30 A.3d 169 (D.C. 2011), and other cases.

*So ordered.*