*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-645

DAVID D. TRAVERS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-17439-12)

(Hon. Stuart G. Nash, Trial Judge)

(Argued May 28, 2015                                    Decided October 8, 2015)

*Justin Murray*, Public Defender Service, with whom *James Klein*, and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*Sharon A. Sprague*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *Andrea Hertzfeld*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, *Associate Judges*, and KING, *Senior Judge*.

Opinion for the court by *Senior Judge* KING.

Dissenting opinion by *Associate Judge* GLICKMAN at page 17.

KING, *Senior Judge*:   Appellant, David Travers, appeals several felony assault and mayhem convictions arising out of an incident occurring on October 6, 2012.  He contends that the trial court erred in not allowing him to testify about certain matters involving the complaining witness which he maintains would have bolstered his claim of self-defense.  We agree and reverse the convictions.

## I.

In October 2012, Travers resided with the complaining witness: his older sister, Rosaline Bethel, in her Southeast apartment.  At that time, she was in her early sixties and he was in his early fifties.  Bethel, who suffered from multiple sclerosis, had raised Travers and the two shared a good relationship.  He assisted Bethel with cooking, cleaning, and taking her medication.  On October 5, Bethel, accompanied by her boyfriend, Joseph Scott, returned home from the grocery store and found that Travers had a female companion in his room.  Having seen the same woman in his room the night before, Bethel reminded her brother that "no woman spends the night in my house" and that the woman could not stay.[1]

---

[1]  Bethel testified that Travers seemed to be "high" and he confirmed that he had used cocaine on that day.

Later that night, Bethel called the police and reported that Travers had hit her. When questioned by Officer Berrita Willis, Bethel stated that she and Travers "had gotten into a verbal altercation about him having women in the house." [2] Travers was not arrested, but volunteered to leave the apartment. Around 2:30 a.m. the next morning (October 6), he returned to the apartment, and hearing a noise, he went into Bethel's room to check on her.[3] Travers approached the side of the bed where Bethel was lying, which was on the "far side of the room towards the window." Scott was also in the bed on the side closest to the door. The room was dark when Travers entered and he did not turn on the lights. Travers asked Bethel if she was okay, and she sat up in the bed and "started fussing, cussing, [and] saying things like I know that you have a bitch with you . . . get the bitch out." Travers responded, "go back to sleep[,] I will talk to you in the morning." As he proceeded to leave the room, Bethel yelled, "get him" and Scott arose from

---

[2] Travers's testimony about the reason for the argument differed from that of Officer Willis, who responded to Bethel's earlier 911 call and testified regarding what Bethel had told her. Travers testified that the altercation on October 5 began when his friend, William Murray, came to the apartment. He stated that Bethel was intoxicated and began cursing at Murray in order to get him out of the apartment.

[3] The facts regarding the October 6 assault are largely taken from Travers's testimony. Bethel testified that the assault occurred on October 5 after she returned from the store and the next thing that she remembered was waking up in the hospital five days later. Scott did not testify.

the bed and moved towards Travers. Travers then grabbed a golf club, which was near the foot of the bed, and started swinging. Soon afterwards, Bethel screamed that she had been hit.

Upon hearing Bethel's statement that she had been hit, Travers stopped swinging the golf club and called 911. Officers Denton and Bauer responded to the call and were met by Travers at the front of the building. Travers directed the officers into the apartment building, where Bethel was lying at the entrance of her apartment, screaming hysterically. According to Officer Denton's testimony, Bethel was bleeding profusely and her head had "been flattened and you could actually see what looked to . . . be a part of bone." When asked who hit her, Bethel pointed at Travers, who then turned around, placed his hands behind his back, and stated, "she understands . . . [w]e're family . . . I'm the guy that you're looking for . . . [s]he understands because we are family." Scott was also struck by the golf club swung by Travers and he suffered a laceration to his left ear. Travers was arrested and later indicted for charges related to Bethel's and Scott's injuries.[4]

---

[4] Travers was indicted on the following charges in relation to crimes against Bethel: aggravated assault while armed of a senior citizen, D.C. Code §§ 22-404.01, -3601, -4502; mayhem while armed of a senior citizen, D.C. Code §§ 22-406, -3601, -4502; assault of a senior citizen with a dangerous weapon, D.C. Code §§ 22-402, -3601; assault with significant bodily injury, D.C. Code § 22-404 (a)(2); and simple assault, D.C. Code § 22-404 (a)(1); and regarding Scott: assault

(continued…)

At trial, Bethel's testimony regarding the time the events in this case occurred conflicted with the time of Travers's 911 call.[5] According to Bethel, the assault with the golf club happened on October 5, after she returned from the store. She testified that the last thing that she remembered was Travers hitting her with the golf club and the female guest telling Travers that he was wrong. Bethel testified that she didn't remember anything after that point except waking up at Washington Hospital Center five days later.

Travers testified that he and Bethel had a good relationship, but would sometimes argue over her alcohol consumption. He stated that Scott would provide alcohol for Bethel and as a result the two men had a strained relationship and frequently argued. Travers described a previous altercation with Scott, during which Scott entered the bathroom while Travers was using it and demanded that he get out. The day after the incident, Scott approached Travers at a bus stop and

_____
(…continued)
with a dangerous weapon, D.C. Code § 22-402; and assault with significant bodily injury, D.C. Code § 22-402 (a)(2).

[5] Ms. Bethel suffered a "depressed skull fracture," broken right pinky finger and right forearm, and the loss of her left eye. She spent five days in a coma and suffered from short-term memory loss. She remembered that appellant had hit her with the golf club, but thought that it had occurred after she returned from the grocery store around 5 or 6 p.m. on October 5.

stated, "I'll deal with you later." Travers described Scott's demeanor at that time as "[h]ostile, with scary eyes . . . just a mean person." Scott had previously threatened Travers by stating that he had undergone military training, which could be used "to hurt, kill, maim, [and] destroy." Travers also testified that Scott owned and carried a knife, which he had seen in Scott's "right back pocket" and under the bed Scott shared with Bethel. Travers further testified that on the night of the assault, while Scott was moving towards him, he felt that he was in danger from Scott. He stated that he accidentally struck Bethel with the golf club while defending himself against Scott, who did not testify at trial.

During the cross-examination of Bethel, defense counsel sought to question her about prior, specific acts, in which she assertively induced friends to attack family members and whether just before she was struck by Travers, she directed Scott to "get him," referring to Travers. Defense counsel's theory was that Travers reasonably believed that Bethel intended to have him harmed, based on having heard her instruct Scott to "get him," coupled with the knowledge that she previously had instigated similar attacks on other relatives. The court denied defense counsel's motion in part, finding that it was proper for defense counsel to cross-examine Bethel about stating the words, "get him," but prevented counsel from asking questions about prior incidents regarding Bethel's reputation. The

court reasoned that it was not necessary to present evidence of Bethel's reputation because there was no ambiguity in the words "get him."

Subsequently, counsel attempted to examine Travers regarding those same prior incidents in which Bethel had directed friends to attack his brother and a nephew. Counsel argued that the evidence was relevant to Travers's "subjective belief . . . at that time and his reasonable fear which was influenced by his knowledge of her having done something similar to that in the past which he would testify happened on October 6, 2012." The court ruled, however, that it was not relevant whether "[Ms. Bethel] ha[d] asked people to do it in the past" because Travers would testify that he heard her say "get him" and there was no reason for Travers to "wonder whether she really told Scott to attack [him] or not." The court stated that what was relevant was "whether people ha[d] followed through on her requests." Counsel then informed the court that Bethel had previously orchestrated an attack on Travers's brother by ordering friends to "hit him in the face," but counsel could not say with certainty whether any attack had actually occurred. The court concluded that testimony from Travers would have amounted to impermissible propensity evidence, which would require instruction to the jury that it could not be taken as though Bethel had really done those acts in the past.

The government argued that the evidence "would not bear on . . . whether or not it would be reasonable to think that [Bethel] would do that with respect to [Travers]" nor "whether . . . she would ask it of Mr. Scott." The court agreed, finding that

> If he will testify that he overheard her tell Scott to attack him, that is perfectly reasonable for you to elicit that. But, the fact that she may have done this in connection with some other family members at some point in the past, I don't believe that's relevant to anything before the jury. Under the laws of evidence, whatever her answer is, it would be that she may have done this in the past is probative in any way other than through a propensity argument as to whether she did it on this occasion. That goes even for its effect of his state of mind. I do not see that his state of mind that it would be influenced in any—well, the circumstances of that other occasion are going to be significant—well, sufficiently different from the circumstances in this case. It just would not have any reasonable bearing on his state of mind as to whether Scott really would attack him based on Ms. Bethel's direction to do so.

The court ruled that counsel was allowed to elicit answers regarding only "Scott's propensity for violence or prior bad acts."

During closing arguments, the prosecutor urged the jury to view Bethel as an innocent sixty-three-year-old disabled woman who was purposefully "bludgeoned"

by Travers. It asked the jury to call into question whether Bethel, "who expressed genuine care and concern for what happened to her brother," would instruct Scott to "get him" and whether Scott actually got out of the bed to attack Travers. Travers was found guilty of all charges relating to the October 6 assault on Bethel.[6]

## II.

Travers argues that the court erred by precluding him from presenting the evidence of Bethel's prior acts instigating violence, which would have supported his claim of self-defense. Relying on cases in which this court has held that a complainant's prior acts of violence that are known to a defendant claiming self-defense are admissible as relevant evidence, Travers contends that his awareness of Bethel's prior bad acts was relevant to show that he "subjectively believed that he was in peril" and his "fear of imminent bodily harm was objectively reasonable." He asserts that the court's ruling "severely hampered [his] ability to explain his

---

[6] Travers was found guilty of aggravated assault of a senior citizen while armed, D.C. Code §§ 22-404.01, -3601, -4502; mayhem while armed of a senior citizen, D.C. Code §§ 22-406, -3601, -4502; assault of a senior citizen with a dangerous weapon, D.C. Code §§ 22-402, -3601; and assault with significant bodily harm, D.C. Code § 402 (a)(2).

conduct to the jury" and "usurped the role of the jury by . . . discrediting his proffered testimony about his own state of mind."[7]

## III.

We review the trial court's ruling to exclude evidence under the abuse of discretion standard. *See Harris v. United States*, 618 A.2d 140, 143 (D.C. 1992). "A trial court has broad discretion to make evidentiary rulings because of its familiarity with the details of the case and expertise in evidentiary matters," *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014), and "will be upset . . . only upon a showing of grave abuse." *Jones v. United States*, 739 A.2d 348, 350 (D.C. 1999) (citation omitted). However, "we do not regard relevance as a particularly high bar for the proponent of the evidence to clear, and we are more searching in our review of a ruling that a piece of evidence is irrelevant if the appellant makes a showing that it was central to his or her defense." *Richardson*,

---

[7] Travers also argues, and the government agrees, that the convictions for aggravated assault while armed, mayhem while armed, and assault with a dangerous weapon merge; and his conviction for assault with significant bodily injury is a lesser included offense of aggravated assault while armed. In light of our conclusion that the convictions for all charges should be reversed, we need not address that argument at this time.

98 A.3d at 186-87 (citing *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010) (internal citation omitted)).

Evidence is relevant if it "tend[s] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Richardson*, 98 A.3d at 186 (citing *In re L.C.*, 92 A.3d 290, 297 & n.21 (D.C. 2014)). Such relevant evidence must be "related logically to the fact that it is offered to prove . . . the fact sought to be established by the evidence must be material . . . [and] the evidence must be adequately probative of the fact it tends to establish." *Jones*, 739 A.2d at 350 (quoting *Freeman v. United States*, 689 A.2d 575, 580 (D.C. 1997)).

"A person's right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening." *Richardson*, 98 A.3d at 187-88 (citing *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984)). One who is defending against an assault charge, who is claiming self-defense, must have honestly and reasonably "believed that he was in imminent peril of death or serious bodily harm, and that his response was necessary to save himself." *Edwards v. United States*, 721 A.2d 938, 941 (D.C. 1998) (quoting *Harper v.*

*United States*, 608 A.2d 152, 154-55 (D.C. 1992)). We have held that such a defendant's knowledge of a victim's prior bad acts or reputation for violence is relevant to proving the reasonableness of appellant's state of mind when asserting a claim of self-defense. *See King v. United States*, 177 A.2d 912, 913 (D.C. 1962) (holding that appellant's awareness of complainant's violent reputation and prior fights with fellow co-workers was relevant evidence that appellant's use of force was based on a "reasonable apprehension for his own health and safety"); *Cooper v. United States*, 353 A.2d 696, 700 n.8 (D.C. 1975) (holding that evidence of victim's reputation for violence or specific prior acts of violence, which were known to the accused "may be used to support [his/her] claim of self-defense"); *McBride v. United States*, 441 A.2d 644, 655 (D.C. 1982) (concluding that the evidence of "communicated and uncommunicated threats [was] relevant to appellant's claim that she . . . [acted in] self-defense"); *Fersner*, 482 A.2d at 391 ("The victim's perceptions may include, for example, an enhanced sense of peril based on personal knowledge that the attacker has committed prior acts of violence."); *Hart v. United States*, 863 A.2d 866, 871 (D.C. 2004) (holding that the trial court correctly admitted evidence of victim's prior acts of violence against appellant "to show the reasonableness of the appellant's fear of the complainant, but erred in refusing to admit reputation evidence for that purpose").

Here, Travers sought to introduce evidence that on two prior occasions Bethel ordered attacks by companions on two family members. First, he attempted to cross-examine Bethel to that effect, but the court disallowed that line of questions, ruling that there was no need to present evidence of her reputation. Second, defense counsel sought to elicit from Travers his knowledge of those prior two incidents, which counsel argued influenced Travers's subjective belief and his reasonable fear at the time of the offense. The trial court ruled, however, that the prior incidents were significantly different from Travers's case and the evidence had no bearing on his state of mind regarding whether Scott would attack him at the direction of Bethel.

Contrary to the trial court's ruling, we think that testimony by Travers regarding the two prior incidents was relevant to whether he honestly and reasonably believed he faced imminent harm, due to Bethel's order to Scott to "get [Travers]." Travers testified that he believed that Scott posed an actual, imminent, physical threat to him, but that Bethel was the instigator of that harm by her order to Scott. Based on this testimony, we think the jury could have found (but was not compelled to do so) that Travers was reasonably in fear of Scott as an instrument of physical force inflicted upon him in response to Bethel's order to that effect. It

follows, therefore, that Travers was entitled to have the jury hear that testimony and weigh it with the other evidence asserted in support of the self-defense claim.

Travers's fear of Scott was heightened by his knowledge that Bethel had initiated or attempted to initiate that same type of violence on two previous occasions. Moreover, Travers testified to his knowledge of Scott's military training to "hurt, kill, maim, [and] destroy"; that Scott carried a knife and that Travers had previously seen the knife under Bethel's bed; that Scott threatened to deal with him later after the two had an argument; and that Travers and Scott often argued about Scott's negative influence on Bethel. Nor can we agree that this case is significantly different from the prior two incidents, where the same activity occurred — Bethel ordering that family members be attacked. Bethel's orders to attack family members could reasonably have led Travers to believe that he was going to be attacked by Scott, whether those prior attacks occurred or not.

The government urges us to distinguish this case from those cases cited above by arguing that Travers's fear of imminent bodily harm was caused by Scott, not Bethel, and any evidence of her prior bad acts was irrelevant and amounted to impermissible propensity evidence. We disagree because we think Travers's knowledge of Bethel's conduct of commanding attacks on other relatives was

relevant to his perception that he was in danger. *Richardson*, 98 A.3d at 187-88. This is especially so in light of Bethel's directive to Scott to "get him," as he moved toward Travers in the dark bedroom. Travers's knowledge of those prior similar incidents was relevant evidence of Bethel's prior bad acts and reputation for violence. *Hart*, 863 A.2d at 870-71.

Moreover, we fail to discern how Travers's testimony would have prejudiced the government in any manner. The evidence could have supported Travers's claim of self-defense and there was ample opportunity for the government to disprove that theory. *See Richardson*, 98 A.3d at 187 n.11 (citation omitted) (once self-defense is established, the burden shifts to the government to disprove the defendant's theory). In fact, because Travers was not allowed to testify regarding Bethel's prior acts instigating assaultive behavior, the government was able to characterize Bethel as a helpless old woman and misconstrue Travers's belief that Scott was about to attack him.

To that same effect, we cannot agree "that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The government proffered evidence of Bethel's injuries and the crime scene, which showed Bethel's blood-covered bed and floors. During closing

argument, the government took the opportunity to remind the jury of Bethel's emotional testimony and cast doubt on any suggestion that Travers had accidentally struck someone the prosecution described as an innocent disabled old woman. The government also called into question the reasonableness of Travers's belief that Scott was going to attack him at the direction of Bethel. There was a real possibility, however, that the jury, with the knowledge of Bethel's prior acts of violence, could have rendered a different verdict or at least could have considered such relevant evidence in its decision. The government cannot show, however, that it is "highly probable that [the] error did not contribute to the verdict" or that the exclusion of this evidence was "sufficiently insignificant to give us fair assurance that the judgment was not substantially swayed by it." *In re Ty.B.*, 878 A.2d 1255, 1267 (D.C. 2005) (emphasis omitted).

In sum, the evidence that Travers sought to introduce was his testimony regarding prior acts of violence by his purported instigator of an assault by Scott and the trial court abused its discretion by precluding him from testifying about his knowledge of those prior two incidents. Travers should have been allowed to testify regarding those prior bad acts committed by Bethel, not as propensity evidence, but to support his claim of self-defense. For that same reason, we conclude that the trial court erred in ruling that Bethel could not be cross-examined

about the prior incidents. *See Dockery v. United States*, 746 A.2d 303, 306-07 (D.C. 2000) (quoting *Home Ins. Co. v. Weide*, 78 U.S. 438, 440 (1870)) ("[I]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury.").

Accordingly, we reverse all of the convictions and direct that in any new trial, the court allow Travers to present evidence regarding Bethel's commands to have others attack family members.

*So ordered.*

GLICKMAN, *Associate Judge*, dissenting: "An evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse."[1] In my view, appellant has not made such a showing with respect to the rulings in this case precluding him from cross-examining Ms. Bethel about prior occasions on which she allegedly urged someone other than Mr. Scott to attack another family member, and from testifying to his own awareness of such incidents. On the

---

[1] *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010) (internal quotation marks omitted).

contrary, I think the trial judge reasonably concluded, after a full and deliberate inquiry, that the proffered evidence lacked legitimate probative value, and thus its exclusion was well within the ambit of the judge's discretion.

Appellant argued that evidence of Ms. Bethel's prior incitements to violence and his awareness of that conduct was admissible for two reasons: (1) to show the likelihood that Ms. Bethel actually did urge Mr. Scott to "get" appellant (which she denied); and (2) to show the reasonableness of appellant's perception that he needed to defend himself from Mr. Scott. The judge correctly rejected the first of these rationales as an improper propensity argument, one foreclosed by the general rule that a witness's prior acts of violence (or other wrongful acts) are not admissible to prove that the witness acted in conformity with such conduct on a later occasion.[2]

The judge recognized the potential applicability of the second rationale. He stated, accurately, that "[s]pecific acts of violence by the victim that are known to the defendant can bear on the defendant's reasonable belief that he needed to act in

---

[2] *See Harris v. United States*, 618 A.2d 140, 144 (D.C. 1992); *see also* Fed. R. Evid. 404 (b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

self-defense." This is so, in the typical case, because the victim whose prior violent acts were known to the defendant is the same person against whom the defendant claims to have needed to use force to defend himself.[3]

As the judge realized, however, this case is atypical because appellant's self-defense claim did not depend on the reasonableness of his fear of Ms. Bethel. He was not defending himself against her, nor did he claim to have been afraid that she was going to injure him. Appellant claims to have struck Ms. Bethel not in legitimate self-defense, but by accident. The alleged assailant against whom appellant claims he was defending himself was Mr. Scott. But appellant did not proffer that Ms. Bethel previously had urged Mr. Scott to attack anyone, or that Mr. Scott was even peripherally involved in her prior efforts to incite violence. Appellant also failed to proffer that any of the past incidents resulted in physical violence, or that they occurred under reasonably comparable circumstances. It therefore was difficult to see from appellant's proffer how his awareness of Ms. Bethel's prior efforts to incite violence bore on the reasonableness of his fear of Mr. Scott.

---

[3] *See, e.g.*, *Harris*, 618 A.2d at 143.

Appropriately, then, the trial judge examined with counsel the question of the relevance of appellant's awareness of Ms. Bethel's prior acts of incitement. Two possible theories of relevance were explored. First, the judge inquired whether Ms. Bethel's alleged attempts to provoke violence in the past actually led to violence or not, since that might bear on whether it was reasonable for appellant to believe Mr. Scott really would attack him "based on her say so." The measure of relevance on this theory, the judge reasoned, depended "not [on] whether she has made the request of other people in the past. . . . [but on] whether people have followed through on her requests and actually attacked people in the past based on her request." But appellant's counsel did not know whether Ms. Bethel's words ever had precipitated any actual violence, and while she offered to inquire of appellant, she never augmented her proffer with the information the judge sought. The prosecutor argued that even if appellant knew some other person had attacked someone else at Ms. Bethel's behest on a prior occasion, that said nothing about whether it was reasonable for appellant to think *Mr. Scott* was willing to attack *him* on *this* occasion. The prosecutor's argument ultimately persuaded the judge.

Alternatively, the judge considered appellant's argument that his knowledge of Ms. Bethel's prior efforts to incite violence bore on whether he reasonably *understood* that she had asked Mr. Scott to attack him. The judge inquired whether

there was any ambiguity in the words appellant allegedly heard Ms. Bethel say to Mr. Scott (i.e., "get him"), and appellant's counsel conceded, "I don't think that there is ambiguity." Ultimately, the judge reasoned that, since appellant would testify he actually heard Ms. Bethel tell Mr. Scott to attack him, her alleged efforts to incite violence on earlier occasions were not relevant to his understanding of her words:

> [T]he fact that he will testify that he heard her say that, I am not sure that it is really relevant that she has asked people to do it in the past because now he is not wondering, I wonder whether she really told Scott to attack me or not, whether I should believe this person who just told me that. He does not have to engage in that because he will testify that he actually heard that conversation.

Appellant's counsel did not dispute the logic of this reasoning or retract the concession that Ms. Bethel's words were unambiguous. For its part, the government did not deny the threatening meaning of the words "get him"; it disputed only appellant's claim that Ms. Bethel uttered those words.

In further colloquy, the prosecutor focused on another deficiency of appellant's proffer—the absence of any information in it as to when, and under

what circumstances, Ms. Bethel supposedly told people to attack two of her family members. Appellant, who never claimed to have witnessed the prior incidents himself, did not proffer how he had become aware of them or how much (or little) he knew about the incidents. As the prosecutor pointed out, the actions might have taken place in the distant past, and under circumstances vastly different from those confronting appellant when he entered Ms. Bethel's bedroom in the middle of the night. Without more detail, how could a jury (properly) attach significance to appellant's mere awareness that Ms. Bethel, for unknown reasons at some unspecified times, had encouraged someone other than Mr. Scott to strike a member of her family other than appellant? The trial judge noted that "the circumstances of that other occasion are going to be significant," but appellant did not amplify his proffer in response to this point.

In my opinion, given the thoroughness of the judge's inquiry and skimpiness of appellant's proffer, the judge had ample grounds to find that appellant's mere awareness of Ms. Bethel's prior attempts to provoke attacks did not "conduce[] in any reasonable degree to establish"[4] the reasonableness of his resort to violence in

---

[4] *Dockery v. United States*, 746 A.2d 303, 307 (D.C. 2000) (quoting *Home Ins. Co. v. Weide*, 78 U.S. 438, 440 (1870)).
.

professed self-defense. The legitimate probative value of the proffered testimony was notional and slight at best.[5]

I fully appreciate that a trial judge must be guided by the principle that "[t]he probativity threshold for purposes of admissibility is low: An item of evidence, to be relevant, need only 'tend[ ] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence.'"[6] Nonetheless, as this court has emphasized, "[t]he trial court enjoys particularly broad discretion in

---

[5] Moreover, as the trial judge recognized, there was the risk that the jury would be inclined to misuse the proffered testimony as propensity evidence helping to prove that Ms. Bethel likely did command Mr. Scott to "get" appellant. Although the judge did not base his rulings on a Rule 403 determination that the minimal probative value of the proffered evidence was substantially outweighed by the danger of unfair prejudice arising from such potential misuse, *see (William) Johnson*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc), the need to guard against this danger further supported the reasonableness of the judge's rulings.

I think it is worth observing that trial judges not infrequently declare evidence to be irrelevant when, I infer, they really mean that the slight probative value of the evidence is substantially outweighed by the risk of unfair prejudice or other considerations justifying exclusion. Often, I suspect, everyone in the courtroom understands that this Rule 403 balancing is the true rationale for the judge's ruling, for which a declaration of irrelevance is simply shorthand. For purposes of appellate review, it would be best, when this is so, for judges to articulate their reasons for excluding evidence more precisely.

[6] *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014) (quoting *Punch v. United States*, 377 A.2d 1353, 1358 (D.C. 1977)).

determining the relevance of a piece of evidence because the inquiry is fact-specific and proceeds under a flexible standard."[7] This standard requires that the trial judge be given considerable leeway to evaluate the relevance of proffered evidence and exclude it if he reasonably finds it lacking in legitimate probative value—even if appellate judges, reviewing the proceeding in the quiet of their chambers, are able to discern some minimal probativity that escaped the trial judge's notice.[8]

Thus, our task is to review the trial judge's rulings for abuse of discretion. "This *most* deferential standard of review allows the trial judge a limited right to be wrong. It also requires the appellate court to assure itself only that certain indicia of rationality and fairness have been met."[9] More specifically, we have said that

---

[7] *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014); *see also (William) Johnson*, 683 A.2d at 1095 (recognizing that the evaluation of evidence for relevance "is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision").

[8] *Cf. Price v. United States*, 697 A.2d 808, 818 (D.C. 1997) (holding that trial court had discretion to exclude evidence having, "at best," only "marginal relevance").

[9] *United States v. Felder*, 548 A.2d 57, 62 (D.C. 1988) (emphasis in original) (internal quotation marks omitted); *see also In re L.C.*, 92 A.3d at 299 ("[T]o say the trial court did not *abuse* its discretion is not to say the court exercised its discretion properly.") (emphasis in original); *(James) Johnson v.*

(continued…)

"we apply a five-part test in which we consider: (1) whether the decision at issue was committed to the trial court's discretion; (2) whether the trial court recognized that it had discretion and whether it purported to exercise it; (3) whether the record reveals sufficient facts upon which the trial court's determination was based; (4) whether the trial court failed to consider a relevant factor or relied upon an improper factor, and whether the reasons given reasonably support the conclusion; and (5) whether the error, if any, was harmless."[10] Applying this test here, I think the record shows that the trial judge easily passed it—after thorough inquiry and consideration of the applicable rules of evidence, the judge reasonably concluded that the vague evidence appellant proffered lacked legitimate probative value. Even if we might demur, in my estimation the evidence as proffered was of marginal relevance at best. Accordingly, I cannot agree that the judge abused his discretion (let alone that he "gravely" abused it), and so I respectfully dissent.

_____

(…continued)

*United States*, 398 A.2d 354, 363 (D.C. 1979) ("An exercise of discretion may be erroneous but still be legal and free from abuse.").

[10] *Richardson*, 98 A.3d at 186 (internal quotation marks, brackets, and ellipses omitted).